912 F.Supp. 438 (1995)
DEACONESS HEALTH SERVICES CORPORATION, d/b/a Deaconess Medical Center Central Campus, Plaintiff,
v.
Donna E. SHALALA, Secretary of Health and Human Services, Defendant.
No. 4:93 CV 1594 DDN.
United States District Court, E.D. Missouri, Eastern Division.
October 16, 1995.
*439 Ronald N. Sutter, Powers, Pyles, Sutter & Verville, P.C., Harry B. Wilson, Husch and Eppenberger, St. Louis, MO, for Deaconess Health Services Corporation dba Deaconess Medical Center Central Campus.
Wesley D. Wedemeyer, Office of U.S. Attorney, St. Louis, MO, for Department of Health and Human Services sec. Donna E. Shalala.

MEMORANDUM
NOCE, United States Magistrate Judge.
This matter is before the Court upon the cross motions of the parties for summary judgment under Federal Rule of Civil Procedure 56. The parties have consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge. 28 U.S.C. § 636(c).
Plaintiff, Deaconess Health Services Corporation, is a not-for-profit hospital in St. Louis, Missouri, that participates in the Medicare and Medicaid programs. Plaintiff commenced this action on July 9, 1993, challenging the construction adopted by the defendant, the Secretary of the Department of Health and Human Services ("the Secretary"), of a Medicare statute directing the Secretary to make additional Medicare payments to hospitals, such as the plaintiff, that serve "a significantly disproportionate number of low-income patients." Specifically, plaintiff challenges the Secretary's regulatory interpretation of the disproportionate share payment adjustment for inpatient hospital services under the Medicare "Prospective Payment System" (PPS). 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106(b). Plaintiff seeks declaratory and injunctive relief and additional payment the hospital alleges it is owed under the Medicare statute.
Based on the record proffered by the parties, the undersigned finds the following facts undisputed:

FACTS
1. Congress enacted the Medicare program (Title XVIII of the Social Security Act) in 1965. Pub.L. No. 89-97, § 102(a); 42 U.S.C. §§ 1395 et seq. Medicare is a health insurance program that pays for covered medical care primarily to qualifying aged and disabled persons. The Medicare program consists of two main parts. Part A ("Hospital *440 Insurance Benefits") authorizes payment for primary institutional care, including hospital, skilled nursing facility, and home health care. 42 U.S.C. §§ 1395c-1395i-4. Part B ("Supplementary Medical Insurance Benefits") authorizes payment for physicians' and other non-hospital supplemental services. 42 U.S.C. §§ 1395j-1395w-4. This case involves Medicare payment for hospital services under Part A. Medicare Part A pays the costs of inpatient hospital services and related post-hospital services, and is funded by hospital insurance taxes. 42 U.S.C. §§ 1395c, 1395d, 1395i. Part A services are furnished by "providers of services," and a hospital may participate in the Medicare program as a provider by entering into a provider agreement with the Secretary. 42 U.S.C. §§ 1395x(u), 1395cc. Plaintiff is a hospital participating in the Medicare program.
2. Congress also enacted the Medicaid program (Title XIX of the Social Security Act) in 1965. Pub.L. No. 89-97, § 121(a); 42 U.S.C. §§ 1396, et seq. Medicaid is a cooperative federal-state program that furnishes health care to indigent persons who are aged, blind, or disabled, or members of families with dependent children, who meet specified eligibility requirements. 42 U.S.C. § 1396, et seq. The program is jointly financed by the federal and state governments and is administered by the states. Id.; 42 C.F.R. § 430.0.
3. States that choose to participate in the Medicaid program must submit a "state plan" that fulfills the broad requirements imposed by the statute and regulations. 42 U.S.C. § 1396a. Within those broad federal rules, each state determines the type and range of services that are covered, the rules for eligibility, and the payment levels for services. 42 C.F.R. § 430.0. The statute specifies the amount, duration, and scope of medical services which must be covered as well as those which may be covered at state option. See 42 U.S.C. §§ 1396a(a)(10), 1396d. All states must furnish certain minimum benefits, including "inpatient hospital services." See 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(1). The statute also specifies the groups of individuals who must be entitled as well as those who may be entitled at state option. See 42 U.S.C. §§ 1396a(a)(10). Under the Medicaid program, states must provide medical assistance to certain "categorically needy" persons, defined as those persons whose income is below a certain identified level and who are either aged, blind, or disabled, or members of families with dependent children. 42 U.S.C. § 1396a(a)(10)(A). The statute also permits states, at their option, to provide medical assistance to other groups of "categorically needy" persons, and to certain "medically needy" individuals (individuals who would be categorically needy except for their slightly higher income and resources). See 42 U.S.C. § 1396a(a)(10)A(ii). Because of the considerable discretion left to states in formulating state plans, Medicaid programs vary greatly from state to state, both with regard to eligible persons (groups of persons covered) and covered services (benefits provided).
4. Among the benefits covered by Medicare are hospital services. For cost reporting years beginning before October 1, 1983, the Medicare program reimbursed hospital services on a "reasonable cost" basis. 42 U.S.C. § 1395f(b). Effective with cost reporting periods beginning on or after October 1, 1983, Congress adopted a prospective payment system ("PPS") to reimburse most hospitals, including plaintiff, for operating costs of inpatient hospital services. 42 U.S.C. § 1395ww(d). Under PPS, a hospital's actual costs do not determine the Medicare payment that the hospital will receive for its operating costs. Instead, Medicare payments are based upon predetermined nationally applicable rates set on a per-discharge basis. Hospitals are paid a fixed amount for each patient based on one of approximately 490 diagnosis-related groups, subject to certain payment adjustments. 42 U.S.C. § 1395ww(d)(1)-(d)(4); 42 C.F.R. Part 412.
5. When Congress enacted Medicare PPS in 1983, it authorized the Secretary to provide an adjustment, called the disproportionate share adjustment, to PPS payments for hospitals that serve a disproportionate share of low income patients. 42 U.S.C. § 1395ww(d)(5)(F). See Social Security Amendments of 1983, Pub.L. No. 98-21, *441 § 601(e), codified at 42 U.S.C. § 1395ww(d)(5)(C)(i) (1983). This reflected Congressional judgment that low-income patients are usually in poorer health and cost more to treat than others. Rye Psychiatric Hospital Center, Inc. v. Shalala, 52 F.3d 1163, 1164 (2d Cir.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 299, 133 L.Ed.2d 205 (1995). The Secretary, however, declined to make such an adjustment. 48 Fed.Reg. 39,783 (1983). Congress then directed the Secretary, by December 31, 1984, to develop and publish a disproportionate share definition and identify hospitals that met that definition. Deficit Reduction Act of 1984, Pub.L. No. 98-369, § 2315(h), codified at 42 U.S.C. § 1395ww note. By July 1985, the Secretary had not yet complied with this congressional mandate, which resulted in a group of hospitals obtaining a court order directing the Secretary to implement the disproportionate share statutory provision. See Samaritan Health Center v. Heckler, 636 F.Supp. 503 (D.D.C.1985). In 1986, after the Secretary issued disproportionate share criteria (50 Fed.Reg. 53,398-53,400 (1985)), Congress amended the Medicare statute to prescribe a statutory definition of disproportionate share hospitals. Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99-272, § 9105 (1986); Samaritan Health Center v. Bowen, 646 F.Supp. 343, 345-47 (D.D.C.1986); 42 U.S.C. § 1395ww(d)(5)(F).
6. As amended, the Medicare statute directs the Secretary to make an add-on payment for PPS hospitals which serve "a significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). Hospitals qualify under this standard if their "disproportionate patient percentage" exceeds certain thresholds, and the amount of the add-on disproportionate share payment for qualifying hospitals depends on the extent to which their disproportionate patient percentage exceeds the thresholds. 42 U.S.C. § 1395ww(d)(5)(F)(v), (vii). The Medicare statute defines "disproportionate patient percentage" for a cost reporting period as "the sum of 
(I) the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act, and the denominator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this title, and
(II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX [Medicaid], but who were not entitled to benefits under part A of this title, and the denominator of which is the total number of the hospital's patient days for such period.
42 U.S.C. § 1395ww(d)(5)(F)(vi) (emphasis added). The second fraction, which has been referred to as the "Medicaid low income proxy," is the subject of the dispute in this case. The Medicaid fraction is just one factor used in determining Medicare reimbursement.
7. On May 6, 1986, the Secretary adopted regulations implementing the statutory disproportionate share add-on payment. See 51 Fed.Reg. 16,772, 16,776-78, 16,788 (1986), codified at 42 C.F.R. § 412.106. The regulation sets forth the Secretary's interpretation of the Medicaid fraction. The Secretary interpreted the statutory language as follows:
Total Medicaid inpatient days will include all covered days attributable to Medicaid patients including any inpatient days for Medicaid patients who are members of a health maintenance organization. Section 1886(d)(5)(F)(vi)(II) of the Act describes Medicaid patient days as those "... which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX...." Therefore, Medicaid covered days will include only those days for which benefits are payable under title XIX. Any day of a Medicaid patient's hospital stay *442 that is not payable by the Medicaid program will not be counted as a Medicaid patient day since the patient is not considered eligible for Medicaid coverage on those days. For example, if a patient is hospitalized for 15 days and is eligible for Medicaid benefits for 10 of those days, only the 10 covered days will be considered Medicaid patient days for purposes of determining a hospital's disproportionate patient percentage.
51 Fed.Reg. 16,777 (1986) (emphasis added). During the rulemaking process, commenters objected to the proposed rule, arguing that all inpatient days associated with a Medicaid recipient should be counted whether or not the patient was actually covered by Medicaid for those days. The commenters argued that, since a patient would still be "eligible" for Medicaid benefits even though part or all of the patient's care may not be covered by Medicaid for a certain day, all patient days for which care was actually provided to a Medicaid eligible individual should be counted. 51 Fed.Reg. 31,460 (1986). In response, the Secretary stated that:
We believe that the parenthetical phrase "for such days" in section 1886(d)(5)(F)(vi)(II) of the Act was intended to modify the phrase "eligible for medical assistance" and that Congress intended to include only such patient days for which the Medicaid patient was eligible to have his or her care paid for by the Medicaid program. We believe evidence of Congressional intent in this regard may be found in the legislative history of section 1886(d)(5)(F)(vi) of the Act.
The Conference Report described the House bill on section 9105 of Pub.L. 99-272 as defining low income patients as follows: The proxy measure for low income would be the percentage of a hospital's total inpatient days attributable to medicaid patients (including medicaid-eligible medicare beneficiaries)  medicare/medicaid crossovers). (See H.R.Rep. No. 99-453, 99th Cong., 1st Sess. 459 (1985)). The phrase "inpatient days attributable to medicaid patients" supports the commenters' interpretation that all days that are attributable to Medicaid patients (that is, for which the patient is Medicaid-eligible) must be included in the numerator of the definition. However, the House bill's definition was not ultimately accepted by the Conference Committee. The Conference Report states that:
The percentage of low income patients will be defined as the total number of inpatient days attributable to Federal Supplemental Security Income beneficiaries divided by the total number of medicare patient days, plus the number of medicaid patient days divided by total patient days. (Emphasis added.)
(See H.R.Rep. No. 99-453, 99th Cong., 1st Sess. 461 (1985)). The substitution of the term "number of medicaid patient days" in the Conference agreement for the previous term "attributable to medicaid patients" suggests that Congress intended to adopt the definition as we currently understand it (that is, only hospital days covered by Medicaid should be included in the numerator). We believe that Congress consciously changed the focus of the Medicaid definition from the number of days that may be attributable to individuals eligible for Medicaid to the actual "number of Medicaid patient days" (that is, days that were paid for by the State's Medicaid program).
We believe this interpretation, that only Medicaid covered days should be counted, is not inconsistent with the statutory scheme as a whole, since the formula in section 1886(d)(5)(F)(vi) of the Act does not purport to identify all indigent patients. Rather, it refers to certain Medicare and Medicaid patients as an easily and objectively determined proxy for the indigent. Thus, under any reading of the statute, not all indigent patients are included in the formula. A Medicaid eligible recipient who has exhausted his or her benefits is thus situated similarly to the indigent patient who is not eligible for Medicaid at all, and so it is logical to treat them the same for purposes of determining the disproportionate patient percentage.
In addition, given the relatively short timeframe for implementing section 1886(d)(5)(F)(vi) of the Act, we believe it is reasonable to assume that Congress anticipated *443 that the Medicare cost report would serve as the primary source for Medicaid patient day statistics. Our definition of Medicaid patient days is consistent with the way we require Medicaid days to be reported on the Medicare cost report. On that form, a day of care is designated a Medicaid patient day only if the Medicaid program is the primary payor. There is no provision on the form for a patient day being counted as more than one type for payment purposes. We do not believe that Congress intended that an additional reporting mechanism, possibly tied to State eligibility records, be developed to obtain Medicaid statistics on noncovered patient days.
Therefore, since Congress clearly intended that the disproportionate share adjustment be implemented promptly with the data currently available, we believe the definition of Medicaid patient days published in the interim final rule is the one that Congress intended that we adopt.
We should also point out that our interpretation that the Medicaid portion of the definition of the disproportionate share percentage under section 1886(d)(5)(F)(vi)(II) of the Act refers only to Medicaid covered days is consistent with our interpretation of the Medicare portion under section 1886(d)(5)(F)(vi)(I) of the Act (which uses similar language) to refer only to Medicare covered days.
51 Fed.Reg. 31,460-61 (1986). Because the Secretary interprets the Medicaid low income proxy as including only inpatient days actually paid for by state Medicaid plans, days that exceed the length-of-stay payment limits established by states, such as Missouri, that pay hospitals under Medicaid on a per diem basis, will not be counted as Medicaid days under 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). 42 C.F.R. § 412.106(b). See 51 Fed.Reg. 31,460-61 (1986).
8. The Secretary's regulation, 42 U.S.C. § 412.106(b), has been used since May 1986 to calculate Medicare reimbursement of hospitals that treat disproportionate numbers of low income patients. Although Congress has revised other aspects of Medicare reimbursement for low income patient hospital care, it has left the Secretary's interpretive regulation undisturbed.
9. States have considerable flexibility in establishing payment rates for hospital services under their Medicaid programs. 42 U.S.C. § 1396a(a)(13)(A). Most states use a prospective payment system similar to Medicare's in that they pay a fixed amount for a particular DRG. Complaint at 5, ¶ 17; Answer at 4, ¶ 17. However, some states pay a per diem rate. Id. Some of these states pay the per diem rate irrespective of a patient's length of stay. Id. Others, however, establish limits on the number of days for which they will make payment. Id. In these states, hospitals receive as payment the lower of the aggregate limit or the per diem rate multiplied by the number of days in a patient's stay. Id. Thus, they do not receive any additional payment for a stay once the day payment limit has been reached. Id.
10. The State of Missouri pays hospitals for inpatient hospital services furnished under the Missouri Medicaid program on a per diem basis. 13 C.S.R. § 70-15.010(1); Complaint at 5, ¶ 18; Answer at 4, ¶ 18. Certain hospitals (known as Tier 1 hospitals) are not subject to length-of-stay payment limits. 13 C.S.R. § 70-15.010(6)(C)2.A.; Complaint at 5, ¶ 18; Answer at 4, ¶ 18. However, all other hospitals in the state are subject to specified length-of-stay payment limits. 13 C.S.R. § 7015.030(1); Complaint at 5, ¶ 18; Answer at 4, ¶ 18. During its fiscal years ending September 30, 1988, and September 30, 1989 (fiscal years 1988 and 1989), plaintiff did not qualify as a Tier 1 hospital under the Missouri Medicaid program. Therefore, it was subject to the Missouri length-of-stay payment limitations for inpatient hospital services.
11. Part A Medicare providers, such as plaintiff, are paid by a fiscal intermediary (an insurance company under contract with the Secretary) designated by the provider and the Secretary. 42 U.S.C. § 1395h; 42 C.F.R. § 421.103. At the close of a fiscal year, a provider of services submits a "cost report." 42 C.F.R. §§ 413.20(b), 413.24(f). The fiscal intermediary analyzes and audits the cost report and informs the provider of a final *444 determination of Medicare reimbursement. 42 C.F.R. § 405.1803.
12. The fiscal intermediary issued Deaconess's Notice of Amount of Medicare Program Reimbursement ("NPR") pertaining to its cost reporting periods ending September 30, 1988, and September 30, 1989, respectively. (Tr. 39-41, 100-03.) During the hospital's two Medicare cost reporting periods ending September 30, 1988, and September 30, 1989, Deaconess rendered services to Medicare beneficiaries. In determining Deaconess's disproportionate share adjustment for those fiscal years, the hospital's fiscal intermediary included only those days for which payment was made under the Missouri Medicaid program (the state's length-of-stay Medicaid payment limits). It did not include all patient days in which care was provided to a Medicaid patient. The intermediary's exclusion of these Medicaid days reduced plaintiff's Medicare disproportionate patient percentage. The effect was to reduce plaintiff's Medicare payment by approximately $127,610 for fiscal year 1988 and approximately $144,825 for fiscal year 1989.
13. A provider dissatisfied with its intermediary's determination may file an appeal with an administrative body known as the Provider Reimbursement Review Board ("Board"). 42 U.S.C. § 1395oo(a). If the Board determines that it lacks the authority to decide an issue raised by the provider, the provider may obtain immediate judicial review. 42 U.S.C. § 1395oo(f)(1). Deaconess timely appealed the NPRs to the Provider Reimbursement Review Board (PRRB). (Tr. 35-38, 95-99.) It challenged the intermediary's calculation of the Medicaid fraction, contending that the Medicaid days excluded by its Medicare fiscal intermediary must be included as Medicaid days in computing its Medicare disproportionate patient percentage. The PRRB issued determinations that it lacked the authority to decide the issue raised by plaintiff. Administrative Record at 1-2, 72-73. Pursuant to 42 U.S.C. § 1395oo(f)(1), Deaconess requested expedited judicial review of the intermediary's calculation of the disproportionate share patient percentage. The PRRB granted Deaconess's request on May 7, 1993. Complaint ¶ 25. Plaintiff thereupon filed the instant lawsuit.

DISCUSSION
At issue in this case is the Secretary's interpretative definition of the numerator of the Medicaid fraction, specifically the language that "patients who (for such days) were eligible for medical assistance under a state plan approved under [the Medicaid program]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).
The underlying issue is whether the numerator should be calculated by counting all patient days attributable to Medicaid patients, whether or not paid for by state Medicaid plans (the construction urged by plaintiff) or whether the numerator should be calculated by counting only those days that are actually paid by state Medicaid plans (the construction chosen by the Secretary).
Plaintiff argues that the statutory mandate is clear and that the Secretary's interpretation is contrary to the plain meaning of the statute. In the alternative, the plaintiff argues that if the statute is ambiguous, then the Secretary's construction is unreasonable. In support of its position, plaintiff relies on Jewish Hospital, Inc. v. Secretary of HHS, 19 F.3d 270 (6th Cir.1994), in which the Sixth Circuit rejected the Secretary's construction of this section of the statute as inconsistent with the plain meaning of the Medicare statute and unreasonable. The plaintiff also relies on Legacy Emanuel Hospital and Health Center v. Shalala, 1995 WL 433608 (D.Or. April 20, 1995), which adopted the reasoning of the Jewish Hospital court on the same issue. There is no dispute that the issue before this Court is identical to the question of law ruled upon by those two courts.
The defendant argues that the statute does not express the unambiguous intent of Congress and that the Secretary's regulation is based upon a permissible construction of the statute. The defendant argues that plaintiff has failed to establish that the statute is unclear on its face or that the Secretary's interpretation is impermissible under the principles set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). To *445 the extent that the panel majority in Jewish Hospital found to the contrary, the defendant argues that it is wrong and that the dissent was correct in finding that the statute is ambiguous and that the Secretary's interpretation is a permissible construction to which judicial deference is owed. The defendant further argues that the Secretary's construction gives full effect to all words in the statute and takes into account the limited data available to the Secretary when the adjustment became effective. The defendant also argues that the Secretary's interpretation has been in effect for eight years and the Congress, with full knowledge of that interpretation, has left it undisturbed. The defendant asks the Court to find that the Secretary's construction of the Medicaid fraction is clearly a permissible one which should be upheld.
Chevron establishes the standard that this court must use in reviewing an agency's construction of a statute that it administers:
First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines that Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute (footnotes omitted).
Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. In examining Congress' intent, the court uses traditional tools of statutory construction. Chevron, 467 U.S. at 842-43 n. 9, 104 S.Ct. at 2781-82 n. 9. A statute must be construed "`to give effect, if possible, to every word Congress used'" Washington Hospital Center v. Bowen, 795 F.2d 139, 145 (D.C.Cir.1986) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979)).
If the court determines that the statute is silent or ambiguous on the issue, the court looks at the agency's interpretation. Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. In doing so, the court does not have to conclude that the agency construction was the only one permissible or that the agency construction was one the court would have reached. Id. at 843 n. 11, 104 S.Ct. at 2782 n. 11. It is properly the role of an agency to which Congress has delegated policy making responsibilities, and not the courts, to resolve ambiguous statutory issues "which congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with administration of the statute in light of everyday realities." Chevron, 467 U.S. at 865-66, 104 S.Ct. at 2793.

The Language of the Statute
Plaintiff argues that the Secretary's construction conflicts with the plain meaning of the Medicare statute in several ways: (1) It conflicts with the statute's focus on a patient's eligibility, rather than a state's payment to a hospital; (2) it construes the words "medical assistance" to mean "inpatient hospital services" when, in fact, "inpatient hospital services" is only one of twenty-five services encompassed within "medical assistance"; (3) it adopts a standard unrelated to whether patients are "low-income patients"; (4) it assumes that all states pay for services on the basis of days of care when, in fact, the majority do not; and (5) it effectively deletes key passages from the statutory language.
First, the plaintiff argues that the Secretary's construction conflicts with the statute's focus on a patient's eligibility, rather than a state's payment to a hospital. The statute refers to patient days "which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Medicaid]" (emphasis added).
The Secretary argues that the plaintiff has written the words "for such days" out of the statute and that the phrase "for such days" means "state paid days" or the actual duration of the state rendered Medicaid benefits. *446 The Jewish Hospital dissent found that the parenthetical "for such days" actually had meaning and was not superfluous and that the phrase "means patient days actually paid by Medicare." Jewish Hospital, 19 F.3d at 279 (Batchelder, J., dissenting). Defendant argues that being "eligible" is just one part of the broader statutory formula used in the Medicaid fraction, and it cannot be construed in isolation from the rest of the statutory language. The Secretary notes that the words "for such days" appear in the parallel language of the Medicare fraction and that her interpretation harmonizes the use of the phrase "for such days" found in both the Medicare and Medicaid fractions and gives the same effect to that parenthetical language in the Medicaid fraction as it has been given in the Medicare fraction. Defendant points to Judge Batchelder's dissenting opinion, which was that the use of the terms "eligible" and "entitled" reflected the more general use of those terms in the Medicaid and Medicare legislation to describe the respective programs' potential beneficiaries. Id. at 278-79 (Batchelder, J., dissenting).
Eligibility standards for Medicaid are set forth at 42 U.S.C. § 1396a(a)(10) and 42 C.F.R. Part 435.[1] While the states must follow the broad requirements imposed by the Medicaid statute and regulations, states also have flexibility in determining the rules of eligibility. However, an individual must be "needy" and have only very limited income and resources in order to be eligible for medical assistance. See Wilder v. Virginia Hospital Ass'n, 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990). The Missouri regulations establish a limit on a hospital's payment. See 13 C.S.R. 70-15.010(1), 70-15.030(1). It is undisputed that Missouri's regulations do not affect a patient's Medicaid eligibility and that a hospital is not free to discharge a Medicaid patient simply because the day limit has been reached. A hospital has an obligation under the Social Security Act to "assure" that Medicaid services will be provided economically and to the extent medically necessary and are of a quality which meets professionally recognized standards of health care." Failure to comply with these obligations subject a hospital to exclusion from the Medicaid program. 42 U.S.C. § 1320c-5(b)(1); 42 C.F.R. § 1001.701(a)(2). The Missouri regulations provide that "[p]articipation in the program shall be limited to hospitals who accept as payment in full for covered services rendered to Medicaid recipients the amount paid in accordance with the regulations implementing the Hospital Reimbursement Program." 13 C.S.R. § 70-15.010(10).
The Jewish Hospital majority found that the word "eligible" means "capable of receiving" federal medical assistance or Medicaid. The court found no indication from the statute that Congress intended to impute any special meaning to the word "eligible." The court also found that the phrase "the number of the hospital's patient days for such period" modified the term "eligible" and that this phrase speaks to the aggregate number of days for which a hospital provided Medicaid eligible services. Therefore, that court found that all days for which an individual was capable of receiving Medicaid should be figured into the proxy calculation and that a Medicaid eligible person was no less "eligible for medical assistance" on some days simply because his or her state Medicaid program only pays for a fixed number of days. Jewish Hospital, 19 F.3d at 274-75. The majority in Jewish Hospital treated the Medicaid and Medicare fractions as contrasting provisions because Congress used the word "eligible" in the Medicaid fraction and used the word "entitled" in the Medicare fraction. Jewish Hospital, 19 F.3d at 274-75.
Plaintiff argues that both the Medicare and the Medicaid fractions focus on the circumstances of the patient, not the hospital's *447 entitlement to payment. The Medicare statute provides that an individual's "entitlement" to Medicare Part A "is established" by 42 U.S.C. §§ 426 and 426-1. 42 U.S.C. § 1395c. Thus, the reference in the Medicare Low Income Proxy to "patients who (for such days) were entitled to benefits under part A of this title" is clearly to patients who "for such days" met the criteria of 42 U.S.C. §§ 426 and 426-1.
Defendant argues that the phrase "medical assistance under a State plan approved under [Title XIX]" has no broader meaning than to link the Medicaid fraction to the individual state plans, which as plaintiff concedes, vary in coverage. The plaintiff argues that some patients are "eligible for medical assistance" for only a portion of their hospital stay. The parties agree that the majority of states pay under Medicaid on a per stay or a per discharge basis. Therefore, plaintiff argues, it would make no sense to adopt "days paid" by Medicaid as the standard.
The wording of the Medicaid Low Income Proxy is not ambiguous. The statute directs the Secretary to count the number of patient days which consist of "patients who (for such days) were eligible for medical assistance under a State [Medicaid] plan[.]" 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The plain words of the statute indicate that the numerator is to consist of the patient days (without the limitation imported by the defendant) which are attributable to patients "eligible" for medical assistance under a state Medicaid plan. The Secretary's construction conflicts with the statute's focus on a patient's eligibility, by focusing on the state's actual payment to the hospital. The statute does not refer to patient days actually paid or actually reimbursed under Medicaid. The undersigned agrees with the reasoning of the Jewish Hospital majority. If a person generally is eligible for medical assistance under a state plan approved by Medicaid while receiving Part A Medicare services, then all of the days during which such services were received during such eligibility should be included in the numerator of the Medicaid Low Income Proxy, whether or not the state Medicaid plan pays for all such days. Nothing in the statute permits the Secretary to disregard part of the patients' duration of the receipt of Medicare Part A services while otherwise Medicaid eligible and to substitute instead a hospital's limited Medicaid payment entitlement.
The undersigned notes that the statute does not specify "eligible for inpatient hospital services" but rather uses the words "eligible for medical assistance," which conveys a broader meaning. The Medicaid statute defines "medical assistance" as encompassing twenty-five items of care and service. 42 U.S.C. § 1396d(a). "Inpatient hospital services" is only one of those twenty-five items. 42 U.S.C. § 1396d(a)(1). Therefore, even if the Missouri Medicaid regulations rendered a Medicaid patient "ineligible" for inpatient hospital services for a particular day, they would not render the patient "ineligible" for "medical assistance" generally. The patient would still be eligible to receive other services for that day. 42 U.S.C. § 1396d(a)(2)-(25).
This construction supports the statutorily-mandated purpose of the "disproportionate patient percentage," of which the "Medicaid Low Income Proxy" is a component. Congress sought to provide a supplemental PPS payment for PPS hospitals that serve "a significantly disproportionate number of low-income patients...." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). The numerators of the two fractions establishing the "disproportionate patient percentage" identify "low-income patients." The numerator of the Medicaid Low Income Proxy consists of patient days attributable to patients "eligible for medical assistance" because a patient must be a "low-income patient" to be "eligible for medical assistance."
A literal construction of the Medicaid Low Income Proxy provision serves the statutorily-defined purpose. Whether a patient is "eligible for medical assistance" for particular days is directly relevant to whether the patient is a "low-income patient" for those days. On the other hand, the Secretary's construction defeats the statutorily-defined purpose. Whether a state's day payment limits preclude a hospital from receiving Medicaid reimbursement for furnishing care to a patient "eligible for medical assistance" *448 for particular days has no bearing on whether the patient is a "low-income patient" for those days, the relevant consideration under the statute. Jewish Hospital, 19 F.3d at 275.
Because the undersigned concludes that Congress has spoken to the question at issue and that the intent of Congress is clear from the language of the statute, the Court need not address the plaintiff's additional arguments.
For these reasons, the plaintiff's motion for summary judgment is sustained and the defendant's motion for summary judgment is denied. An appropriate order is issued herewith.

ORDER
In accordance with the Memorandum filed herewith,
IT IS HEREBY ORDERED that the plaintiff's motion for summary judgment (Doc. No. 16) is sustained.
IT IS FURTHER ORDERED that the defendant's motion for summary judgment (Doc. No. 18) is denied.
IT IS HEREBY DECLARED that the defendant's construction limiting the numerator of the Medicaid Low Income Proxy (42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) to patient days paid under Medicaid is contrary to the plain wording of the statute.
IT IS FURTHER DECLARED that the numerator of the Medicaid Low Income Proxy includes all patient days attributable to patients "eligible for medical assistance" for such days.
IT IS THEREFORE ORDERED that this action is remanded to the defendant for the prompt payment to the plaintiff of the amount in controversy, plus interest in accordance with 42 U.S.C. § 1395oo(f)(2).
NOTES
[1] A state must make medical assistance available to a group known as the "categorically needy." This group includes individuals who receive aid under title IV-A of the Social Security Act (Aid to Families with Dependent Children ("AFDC")) or title XVI of the Social Security Act (SSI). In addition, states may (at their option) provide medical assistance to a group known as the "medically needy." This group consists of individuals who would be "categorically needy" except that their income exceeds the aid thresholds within specified limits. See DeJesus v. Perales, 770 F.2d 316, 318-319 (2d Cir.1985), cert. denied, 478 U.S. 1007, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986).